# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## Colonial Pipeline Company v. William Lohman, Et. Al.

January 16, 1967.

Record No. 6307.

Present, Eggleston, C. J., and Buchanan, I'Anson, Carrico and Gordon, JJ.

*Ralph H. Ferrell, Jr.* and *Hugh V. White, Jr.* (*Jack Vickrey*; *Howard D. McCloud*; *Hunton, Williams, Gay, Powell and Gibson*, on brief), for the plaintiff in error.

*Frank D. Swart (Leigh, Kincheloe & Swart*, on brief), for the defendants in error.

I'ANSON, J., delivered the opinion of the court.

On August 1, 1963, Colonial Pipeline Company (Colonial) filed its petition in the court below under Code §§ 25-46.1 through 25-46.34, 1964 Repl. Vol., to condemn a perpetual right of way and easement fifty feet wide and 3061 feet long, containing 3.51 acres, through a tract of land in Fairfax county owned by William Lohman and Frieda H. Lohman, and to obtain two temporary working space easements of 25 feet in width, parallel to and abutting upon the permanent easement.

The purpose of the permanent easement was to construct, operate and maintain two pipelines to be used by Colonial for transporting petroleum products as a common carrier. The two pipelines, one 32 inches and the other 6⅝ inches in outer diameter, were to be laid in trenches with a minimum of 30 inches of cover from the top of each pipeline to the normal surface of the ground. The two temporary working space easements would terminate upon the completion of the construction of the pipelines.

Under its petition Colonial would have the right of ingress and egress over the private roads on the landowners' property from time to time in order to maintain and repair the pipelines or to change their size, and to keep the right of way clear of obstructions which might interfere with the operation, maintenance, repair and replacement of the pipelines.

The landowners were to have the right to use and occupy the land within the permanent easement for growing crops, dairy farming, or any other purpose not inconsistent nor interfering with Colonial's right to use and occupy the strip for its stated purpose. They would have the right to erect fences (but no buildings), construct and maintain roads and streets, and install water, sewer, electric, telephone and other utility lines over, across or through the easement area.

Commissioners were appointed to ascertain just compensation to the landowners for the easement taken and damages, if any, to the residue of their property. After viewing the premises, hearing evidence and receiving the instructions of the court, the commissioners rendered their report awarding landowners $8,775 as the value of the

easement taken and $47,528.25 as damages to the residue of the tract, for a total award of $56,303.25.

Colonial filed exceptions to the commissioners' report on the grounds that the award was grossly excessive, was based on erroneous principles, and the court erred in granting and refusing certain instructions; and asked that the commissioners be required to appear and advise the court as to how they made the award, on the ground that "improper conduct * * * may appear" from their examination.

The commissioners were required to appear, pursuant to Colonial's request, and the court examined them as to the manner in which their report was determined. The court then overruled the exceptions and entered an order confirming the award, from which Colonial appeals.

Colonial contends that the trial court erred (1) in confirming the commissioners' report, on the grounds that (a) the commissioners awarded the fee simple value of the 3.51 acres rather than merely the value of the easement taken, (b) the damages to the residue were remote and speculative, and included an amount for the 3.51-acre strip for which the full fee value had been awarded, and (c) in awarding damages to the residue the commissioners included an amount based on the possibility of an explosion, which was not supported by the evidence; (2) in granting instruction B; and (3) in refusing to ask the commissioners questions submitted by Colonial on its allegation that improper conduct may have entered into the award.

The landowners assign as cross-error the action of the court (1) in holding that Colonial did not have to comply with zoning ordinances of the county prior to filing the condemnation petition; and (2) in its determination of the dates on which interest would begin and end.

The tract of land involved contains 271.59 acres, fifty acres of which are flood lands. Although it is used for farming and dairy operations, three real estate appraisers, N. M. Downs and J. W. Mulroy, testifying on behalf of Colonial, and R. M. Wright, testifying on behalf of the landowners, agreed that the highest and best use of the tract was for a residential subdivision.

At the time Colonial filed its petition the property was already bisected by a natural gas pipeline belonging to Transcontinental Gas Corporation which had an easement 105 feet wide and 4200 feet long, occupying approximately ten acres.

Downs testified that the fair market value of the tract was $2,000 per acre and that Colonial's permanent easement depreciated the 3.51-

acre strip fifty percent of its fee simple value, or $1,000 an acre. He concluded that the fair market value of the permanent easement was $3,500, that the value of the temporary construction easement was $100, and that damage to the residue resulting from the permanent easement was $11,000, for a total of $14,600.

Mulroy testified that the fair market value of the entire tract was $2,500 an acre; that the fee to the 3.51 acres which remained in the landowners was worth $500 per acre after the taking; that the value of the flood lands was $500 per acre; and that the land subjected to the easement and the flood lands could be used in determining density for a subdivision. He estimated that $7,000 was the fair market value of the easement taken, that $100 was the value of the temporary easements, and that $9,200 was the damage to the remainder of the tract flowing from the permanent easement, for a total of $16,300.

Wright testified that the fair market value of the tract with no pipeline easements was $3,000 per acre. After reducing the value of the tract by fifteen percent to reflect the Transcontinental easement, he arrived at a figure of $2,500 per acre.[1] On the basis of $2,500 per acre, he fixed the fair market value of the easement taken at $8,775. He said he gave it the full value of the fee because he considered the 3.51 acres of no value as a part of a subdivision and the payment of taxes on the land with the easement attached would offset any remaining value. A value of $500 was put on the temporary easements. Excluding Colonial's easements, he said the fair market value of the tract was $670,000, and he estimated that the damage to the residue would be ten percent of the value, or $67,000.

Colonial presented witnesses who said that the pipelines were constructed in accordance with all applicable safety codes; that petroleum in a pipeline would not explode, but that there could be leakage and fire resulting therefrom.

Orlo C. Paciulli, a consulting subdivision engineer, testifying for the landowners, said that it would be difficult and costly to develop the tract as a subdivision because it would be necessary for its streets, utility lines, drainage and sewer lines to cross Colonial's easement.

Colonial first contends that the commissioners awarded the full fee value of the 3.51 acres rather than the value of the easement taken. It bases its argument on Wright's testimony that he would award the full fee value for the easement; that the commissioners

---

(1) Actually the result is $2,550 per acre, not $2,500.

awarded $8,775, which Wright said was the fee value; and that the landowners were bound by Wright's testimony.

The landowners reply that the $8,775 for the easement was not the full fee simple value; and even if the compensation for the permanent easement was in amount the same as the fee, the award was justified because there was evidence that nothing of value remained after the easement was taken.

In a written opinion the trial judge said that Colonial's conclusion that the commissioners awarded the full fee value for the 3.51 acres was based on the assumption that $2,500 per acre was the full fee value of that portion of the tract subjected to the easement as well as for the entire tract. He pointed out that the commissioners might have concluded from Mulroy's testimony that the $2,500 figure was the average for the entire tract, including the flood plains which Mulroy valued at $500 per acre, so that the acreage within the easement was worth more than the average figure.

We agree with the trial court that the commissioners could have accepted the testimony of Mulroy that the fair market value of the entire tract was $2,500 an acre, and they could have found that the value of the 3.51-acre strip exceeded the average figure; and that the mere coincidence of amount awarded did not establish as a matter of law that the commissioners awarded the full fee value for the easement taken.

We do not agree with Colonial's argument that under *West v. Anderson,* 186 Va. 554, 42 S. E. 2d 876 (1947), the landowners were bound by Wright's testimony that the full fee value of the easement area was $8,775. The rule that a party is bound by his own testimony is applicable to the testimony of the litigant himself but not to a witness offered by a litigant. *May v. Malcolm,* 202 Va. 78, 82, 116 S. E. 2d 114, 118 (1960).

In view of our conclusion, it is unnecessary for us to consider whether the commissioners could allow for a pipeline easement an amount equal to the full fee simple value of the land subjected to the easement. For applicable principles, see generally, 4 Nichols, Eminent Domain, § 12.4(2) (3d ed., Rev. 1962); 27 Am. Jur. 2d, Eminent Domain, § 347, p. 182; Annot., 38 A. L. R. 2d 788, 790-795 (1954).

Colonial next contends that the evidence concerning damages to the residue was remote and speculative and that the commissioners

awarded damages to the easement strip for which they also awarded the full fee value.

Where a part of the land is taken in a condemnation proceeding, it is proper for a commission to consider and allow damages to the residue flowing from the taking. *Tidewater Railway Co.* v. *Cowan*, 106 Va. 817, 822, 56 S. E. 819, 820 (1907). We have repeatedly said that in a condemnation proceeding the proper test to be applied for damages to the residue of the land not taken is the difference in the value before and immediately after the taking. In ascertaining such damages every circumstance, present or future, which affects its then value may be considered. Of course, remote and speculative damages may not be considered or allowed. *Appalachian Electric Power Co.* v. *Gorman*, 191 Va. 344, 353, 61 S. E. 2d 33, 37 (1950), and cases there cited.

In the instant case all the expert witnesses agreed that at the time of the taking the highest and best use of the land was for a residential subdivision, but they disagreed on the diminution in value to the residue. There was evidence that the present value of the tract for a subdivision would be diminished by the pipelines because of increased cost and difficulty encountered in designing and installing storm and sanitary sewers, which depend upon gravity flow, and in obtaining the proper grade for streets.

Wright testified that the diminution in value of the remaining land resulting from the pipelines was ten percent of its fee market value, or $67,000. The commission, after hearing the evidence of all the experts and viewing the land, awarded $47,528.25 for damages to the residue. Since there was evidence to support Wright's estimate of damages to the residue, which was his opinion of the difference in value of the land before and after the taking of the easement, and the amount awarded by the commission was within the estimate, we cannot say as a matter of law that the award was based on speculation.

Colonial argues that the commissioners, in awarding damages to the residue, included the area within the permanent easement for which the full fee value had been awarded. It says that since the commissioners awarded $47,528.25 as damages "to other property," the figures show that the award was based on $175 per acre, or seven percent of the value of 271.59 acres.

As the trial judge pointed out in his written opinion, while the conclusion that the commissioners awarded damages to the land within

the easement was consistent with the mathematical argument advanced by Colonial, speculation would be required to conclude that it was more than coincidence. Hence, Colonial's argument does not establish as a matter of law that the commissioners did in fact award damages for the area occupied by the easement.

■ Colonial contends that the court erred in confirming the commissioners' award because it included an element for the possibility of an explosion, which was not supported by the evidence.

Wright testified concerning the possibility of an explosion in the pipelines and what the county would do in that event. When the court sustained Colonial's objection to that part of the testimony relating to what the county would do, Colonial did not object and except to the failure of the court to rule on the evidence relating to the possibility of an explosion, nor did it request the court to advise the commissioners to disregard Wright's testimony relating to such possibility. *Cf., State Highway Commissioner* v. *Skillman*, 206 Va. 39, 43, 141 S. E. 2d 700, 703 (1965). Hence Colonial did not save the point and may not raise it on this appeal. *Gall* v. *Tea Company*, 202 Va. 835, 838, 120 S. E. 2d 378, 381 (1961); Rule 1:8.

■ Colonial contends that the trial court erred in granting instruction B. It told the commissioners that "in fixing a just compensation for the land taken and for damage to the residue of the Defendants' land, the Commissioners are not limited to the use which the landowners are actually making of the land, but the landowners are entitled to have the Commissioners consider the value of the land for any purpose for which it is reasonably available, and *the landowners are entitled to be compensated for the land taken and for the damage to the residue of their land on the basis of the most valuable purpose for which said land is susceptible of being used.*" (Italics supplied.)

Colonial says that instruction B failed to inform the commissioners that in determining the fair market value at the time of taking they were to consider the uses to which the land might be reasonably adapted only insofar as they were reflected in its present market value; and that instruction 2-C, granted at the request of Colonial, was a correct statement of the law. The instruction reads as follows:

"The Commissioners should consider all uses to which the property may be reasonably adapted with respect to its surroundings and natural advantages or disadvantages, and shall determine

its fair market value at the time of the filing of the condemnation petition in the light of such uses. * * * The uses to which the land is adaptable must be so reasonably probable as to have an effect on the market value of the land at the time of the taking. Purely imaginative or speculative value or uses should not be considered."

The landowners say that instruction B was a correct statement of the law, but even if it was not complete, when it was read along with instruction 2-C it was not prejudicial.

It is true that we said in *Pruner* v. *State Highway Commissioner*, 173 Va. 307, 309, 4 S. E. 2d 393, 394 (1939), "Where landowner's property is taken by eminent domain for a public use he is entitled to be compensated on the basis of the most valuable purpose for which the land is susceptible of being used." However, we further said, "The uses to be considered must be so reasonably probable as to have an effect on the present market value of the land." 173 Va. at 310-311, 4 S. E. 2d at 395.

We agree with Colonial that the instruction should have told the commissioners that in considering uses to which the land was adaptable they were limited to the effect of such uses on the fair market value at the time of the taking. The issue is, what a purchaser at the time of the taking would be willing to pay for the land in its present condition and availability for any particular use, not what someone might be able to realize out of a resale in the future. *Richmond & P. R. Co.* v. *Seaboard, Etc., Co.*, 103 Va. 399, 407, 49 S. E. 512, 515 (1905); *Fonticello Co., Inc.* v. *Richmond*, 147 Va. 355, 361, 364, 137 S. E. 458, 460, 461 (1927). See generally, 1 Orgel, Valuation Under Eminent Domain, § 30, p. 144 (2d ed 1953); 27 Am. Jur. 2d, Eminent Domain, § 280, p. 70.

Our inquiry is now directed to whether the omission in instruction B was supplied by a fuller statement in instruction 2-C.

Where an instruction is not a finding instruction and some element is omitted which should have been included, it is not reversible error to give such instruction if another instruction given by the court includes such omitted element and supplements the incomplete instruction and is not misleading, confusing or contradictory. 10 Mich. Jur., Instructions, § 47, pp. 258, 259, and the numerous cases there cited.

Instruction B is not a finding instruction. It is supplemented by

2-C, and the language of the two instructions when read together is not misleading, confusing or contradictory. This is especially true because all of the testimony of the experts related to fair market value of the tract at the time of the taking. See *Burnette* v. *McDonald*, 206 Va. 186, 193, 142 S.E. 2d 495, 500 (1965).

Hence we hold that although instruction B was incomplete, when read along with instruction 2-C it did not constitute reversible error.

Colonial's last contention is that upon recall of the commissioners the trial court did not examine them in the manner required by Code § 25-46.21, 1964 Repl. Vol., because it refused to ask certain questions submitted by Colonial. A review of Colonial's exceptions and the proposed questions disclose that the essence of the alleged "improper conduct" of which Colonial complains is that "the commissioners misunderstood the instructions or proceeded upon erroneous principles."

In 1956 the General Assembly codified the practice of recalling commissioners to explain their report. Section 25-18.1,[2] Acts 1956, ch. 563, p. 926, read as follows:

"Unless an allegation be made or evidence produced of fraud, collusion, corruption or improper conduct, no testimony shall be received from the commissioners for the purpose of explaining or clarifying the report on the compensation or damages therein set forth. At the hearing of exceptions to the commissioners' report *on the ground that the award is grossly excessive or inadequate or that the commissioners misunderstood the instructions or proceeded upon erroneous principles*, or that there was fraud, collusion, corruption or improper conduct, the court * * * *may* require the commissioners to attend and advise * * * as to the manner in which the report was formulated." (Italics supplied.)

In 1962 the provision for recall of commissioners was replaced by what is now the second paragraph of Code § 25-46.21,[3] 1964 Repl. Vol., Acts 1962, ch. 426, pp. 686, 693:

"Upon hearing of exceptions to the commissioners' report the court shall not recall and question the commissioners as to the

(2) An identical provision was added pertaining to condemnation proceedings instituted by the State Highway Commissioner. Acts 1956, ch. 580, p. 938.

(3) A paragraph with the same language had been added to Code § 33-64 by Acts 1960, ch. 491, p. 763, at 765.

manner in which their report was determined unless there be an allegation in such written exceptions that fraud, collusion, corruption, or improper conduct entered into the report. If such allegation is made the judge *shall* summon the commissioners to appear and he alone shall question them concerning their actions. If the court be satisfied that fraud, collusion, corruption or improper conduct entered into the report of the commissioners, the report shall be set aside and new commissioners appointed to rehear the case." (Italics supplied.)

It will be observed that the 1962 amendment eliminated the reference to hearing of exceptions to the commissioners' report on the grounds that the award was grossly excessive or inadequate or that the commissioners misunderstood the instructions or proceeded upon erroneous principles.

Colonial did not allege fraud, collusion or corruption. Thus the issue is whether misunderstanding of the instructions by the commissioners, or their proceeding upon erroneous principles, amounts to improper conduct so as to justify their recall and examination under the statute as amended.

Colonial argues that the allegations of failure to follow instructions which were sufficient to require the trial court to exercise its discretion to summon the commissioners in *Commonwealth Natural Gas Corp.* v. *Horner*, 200 Va. 824, 108 S. E. 2d 403 (1959), and *VEPCO* v. *Patterson*, 204 Va. 574, 132 S. E. 2d 436 (1963) (condemnation petition filed before effective date of 1962 amendment), remain sufficient to require a recall and examination after the amendment. It says that the purpose of the quoted second paragraph of § 25-46.21 was to make the recall and examination of the commissioners mandatory under proper allegations and to restrict the questioning of the commissioners to the judge alone, without the participation of counsel as permitted in *Horner, supra,* 200 Va. at 832, 108 S. E. 2d at 408.

Colonial points to the fact that the 1962 amendment also added a provision to the first paragraph of § 25-46.21 that the "view shall not be considered by the commission or the court as the sole evidence in the case." It says that the amendment to the first paragraph shows the intention of the legislature to increase the control over a commission's award and it would be inconsistent to interpret the deletion of the reference to excessive or inadequate damages, misunderstanding instructions, and proceeding upon erroneous principles as indicating

legislative intent to restrict the circumstances under which commissioners shall be recalled to explain their report.

However, we think that Colonial fails to distinguish the two questions dealt with by § 25-46.21. Firstly, when and under what circumstances may the court disturb the award by the commissioners? Secondly, when and under what circumstances must the court recall the commissioners to explain their report? It does not necessarily follow that the answers to the two questions are the same.

The first and third paragraphs of Code § 25-46.21 give the trial court the right to set aside an award of a commission which is not supported by the evidence.

The second paragraph of § 25-46.21 deals with recall and examination of commissioners, and that is the one we are concerned with here. We think that the deletion of the language "that the award is grossly excessive or inadequate or that the commissioners misunderstood the instructions or proceeded upon erroneous principles," leaving intact the provision dealing with "fraud, collusion, corruption or improper conduct," indicates the intent of the legislature that the trial court is not to recall and examine the commissioners upon an allegation that the award is "grossly excessive or inadequate or that the commissioners misunderstood the instructions or proceeded upon erroneous principles." We cannot say that "improper conduct" includes the language contained in Code § 25-18.1 which was eliminated in the second paragraph of § 25-46.21.

Thus it was not error for the trial court to refuse to propound questions submitted by Colonial which did not deal with improper conduct within the meaning of the statute.

The landowners first contend in their assignments of cross-error that Colonial was without authority to condemn the easement area since the tract was not zoned for commercial use.

The contention is without merit. There is no provision in the Virginia General Condemnation Act, Code § 25-46.1, ff., 1964 Repl. Vol., or any other statute, making a zoning determination or the issuance of a zoning permit a condition precedent to the institution of condemnation proceedings.

In 6 Nichols, Eminent Domain, § 24.63, pp. 106-107 (3d ed. 1965), it is said:

"In the absence of a statute requiring the consent of a municipality or other public board or officer as a condition precedent

to the institution of condemnation proceedings, such consent need not be obtained. Even where such consent is statutorily required, it may not be the basis of an objection by the condemnee unless the obtaining of such consent is expressly made a condition precedent."

See also, *West* v. *Housing Authority of City of Atlanta*, 211 Ga. 133, 84 S. E. 2d 30, 32, 33 (1954); *Upper Dublin Township Auth.* v. *Piszek*, 420 Pa. 536, 218 A. 2d 328 (1966).

■ Landowners contend that the trial court erred (1) in not allowing interest to run from September 13, 1963, the date on which the court entered an order granting Colonial's application to enter upon their land before the determination of the final award, and (2) in holding that interest did not run after February 26, 1965, the date Colonial paid into court the difference between the amount of the final award and the amount initially deposited.

The trial court's September 13, 1963, order granted Colonial the right to enter upon the land when it deposited into court the amount of its final offer to the landowners and executed a bond conditioned upon its payment into court of all additional amounts of money, if any, thereafter awarded in this proceeding. The order was entered pursuant to the provisions of Code § 25-46.8, which provides in part: "Upon such payment and the giving of such bond, if any is required, * * * the petitioner shall have the right to enter and construct its works and improvements upon or through the property as described in the petition." Colonial did not satisfy the conditions precedent to entry contained in the order until September 19, 1963.

Code § 25-46.31(b) provides for the payment of interest "from the time of such entry." We interpret the phrase "from the time of such entry" to refer to the time at which entry is authorized under the provisions of § 25-46.8, namely, "upon such payment and giving of such bond." Hence we agree with the trial court that interest began to run on September 19, 1963.

We now turn to the question of when interest ceased to run. On February 26, 1965, Colonial paid into court the difference between the intial amount and the amount of the final award. Subsequent therto an order was entered pursuant to the provisions of Code § 25-46.28, referring the case to a commissioner in chancery to determine who was entitled to the award.

The landowners contend that the payment into court on February

26, 1965, did not toll the running of interest because as a result of the referral of the case to the commissioner in chancery, the money was not available to them.

Section 25-46.31(b) provides that in computing interest in a case in which the condemnor has exercised the right of early entry under § 25-46.8, the owner is entitled to interest until payment into court of the sums ascertained in the report of the commissioners.

Code § 25-46.30 provides that after payment into court of the compensation awarded, a landowner may apply to the court for withdrawal *pendente lite* of all, or any portion of, his share of the amount deposited. If he requests withdrawal of an amount in excess of fifty percent of his share, the court may require him to file a bond in the clerk's office.

Under § 25-46.30, the landowners were authorized to apply for the withdrawal of the amount paid into court on February 26, 1965. We conclude that the funds were available to the landowners from February 26, 1965, and interest terminated on that date. Where the landowners have not requested withdrawal under § 25-46.30, they may not complain that the withdrawal might not have been permitted. See, 29A C. J. S., Eminent Domain, § 176(1), p. 767.

For the reasons stated, the judgment of the court below is

*Affirmed.*